## N. Y. SUPERIOR COURT.

JOSEPH F. MARTIN, plaintiff and respondent, agt. WILLIAM
A. FARNSWORTH, defendant and appellant.

In November, 1862, the defendant's bark, Antietam, being ashore near the Delaware
Breakwater he sent a telegram to his agents in New York, as follows: "Lewes,.
Del., Nov. 13, 1862. To Metcalf and Duncan: Send me small tug-boat, steam-
pump, engineer, my diving apparatus and diver, or telegraph Eben Eaton, 90
Bolton Street, South Boston, to come. Make the best trade you can. W. A.
FARNSWORTH," which was received same day.

Messrs. Metcalf & Duncan chartered the plaintiff's tug-boat, May Queen, to go
down to the Delaware Breakwater upon that service. The terms of the charter-
were all agreed upon, except that the plaintiff required a coast pilot to go with
him on his tug-boat. Messrs. M. & D. asked plaintiff what a coast pilot would
cost; he answered that he did not know, that he would get one as cheap as he
could. Afterwards he selected a coast pilot, and introduced him to Messrs. M. &
D., who inquired of the plaintiff if he was satisfied with him, to which plaintiff
replied that he was perfectly; and Messrs. M. & D. thereupon agreed o pay the-
amount of the pilot's wages—$5 per day.

The May Queen sailed from New York in the afternoon of Nov. 14, 1862. After
having run into and remained in Absecom Harbor (80 miles from New York), on.
account of stress of weather, they continued the voyage on the afternoon of Nov.
17. When night came on, the weather had thickened and rain had commenced.
The (coast) pilot was at the helm. The captain, mate, engineer and men had
gone below to supper, leaving the pilot the only person on deck—there being no
lookout. The pilot saw, on the starboard bow of his vessel, a single light. He took
his glass and examined her. She was under sail, and showed but one light, and
did not whistle, and the pilot concluded that she was a sailing vessel, as he had a.
right to, for vessels under steam should show more than one light, and are bound
to whistle when approaching. He accordingly put the helm of the May Queen
to starboard to turn her away from the approaching vessel. She, however, proved.
to be the United States steam gun-boat Wamsutta; which, seeing the May Queen
ahead, put her own helm to port. A collision occurred, by which the May Queen-
was lost.

*Held* by the general term, that the court below should have concluded from the
testimony given that plaintiff was mistaken or forgetful of the specific terms of
the contract about the pilot, and that in truth and fact, Duncan, acting as the-
agent of defendant, only agreed to *pay the expense or hire of the pilot* for the voy-
age, and upon such a conclusion the court should have dismissed the complaint
upon motion, and the refusal so to do was error.

But assuming that the court and jury were correct in their conclusion that defend-
ant did contract with the plaintiff " *to furnish a coast pilot for the voyage*," and.

Martin agt. Farnsworth.

thereby incurred all the liabilities that would ensue from the use of those words, yet as a conclusion of law, such a contract did not make him responsible for the care and management and safe navigation of the vessel on the said voyage, but that the said pilot was received and placed upon said vessel, simply as a *pilot at sea*, to advise and direct the course of the vessel to her place of destination, subject to, and under the general authority and command of her *master*, who was the superior officer of such pilot during the whole voyage, and upon whom (the master) devolved the responsibility of the general care and management of such vessel during her voyage.

The court below erred in its ruling, when it admitted testimony. objected to by defendant, of a usage or custom in regard to *coast pilots* having absolute and supreme control and management of a vessel on a voyage like this, as the superior of the master of said vessel.

Such control and management and the government and discipline of a vessel like this, engaged on such a voyage, should be determined as a question of law, and cannot be considered as a question of fact based upon custom or usage. This power and authority is clearly and unquestionably conferred upon and intrusted *to the master of the vessel* by the common, civil and maritime law, and he (the master) must be held responsible for its non-use, or abuse, and he cannot evade that responsibility, nor shift the same from himself upon other persons by virtue of any custom or usage to the contrary.

*Heard at the October General Term*, 1870.

*Before* MONELL *and* SPENCER, *JJ.*

*Case tried before Judge* McCUNN.

APPEAL from a judgment entered upon the verdict of a jury, in favor of plaintiff, for $7,598 01, in December, 1869.

In November, 1862, the defendant's bark Antietam being ashore near the Delaware Breakwater, he sent the following telegram to his agents in New York:

"*Dated Lewes, Del.*,

" 13, 1862.

"*Received New York, Nov.* 13, 1862.

"To METCALF & DUNCAN:

" Send me small tug-boat, steam-pump, engineer, my diving apparatus and diver, or telegraph Eben Eaton, 90 Bolton St., South Boston, to come. Make the best trade you can. "W. A. FARNSWORTH."

Messrs, Metcalf & Duncan chartered the plaintiff's tug-boat May Queen, or Cinderella, to go down to the Delaware Breakwater upon that service. In regard to the terms of this contract the evidence was as follows:

On the part of the plaintiff, the plaintiff testified: On the

13th of November, 1862, Metcalf & Duncan sent for me, and I went to their office (in New York); they said they had received a telegraphic dispatch from Lewes to send down a small tug-boat to the Antietam; I agreed with them to go down to the Antietam. They were to pay for the coal on board at the rate of $5 50 per ton. I told them they must furnish me a pilot. They said they did not know where there was a pilot at that particular time; they asked me to find one for them. I found Mr. Cutler, and took him in to Metcalf & Duncan the next morning, and they made a bargain with him to navigate the boat for $5 a day, and he was to make himself generally useful in endeavoring to save the Antietam in the interest of her owners when he got down there. The business of the May Queen was towing in and about the harbor of New York and to and from sea; she had no pilot of her own, and the people on board were not acquainted with the navigation along the coast down to the Delaware; it would not have been safe to have sent her without a coast pilot; I would not have sent her without one. When she went upon this voyage she had her usual crew on board, a *competent master*, a *competent first officer*, a *competent engineer*, and a *competent crew*, and she was well equipped in every respect; I found Mr. Cutler (the pilot) at the Hell Gate pilot office; I went there for him; I had known Mr. Cutler as a coast pilot before I took him up to Duncan & Metcalf, and introduced him, saying, "This is Mr. Cutler, a coast pilot;" I then told them to make their own arrangements, that I had nothing more to do with it; William H. Martin, a son of mine, was master of the boat; he was about twenty-three years of age.

On the part of the defense, Samuel Duncan, of the firm of Metcalf & Duncan, ship agents, &c., testified:

I negotiated a charter of this vessel in question in pursuance of that telegram; that was my authority, and the only authority I had; I received the dispatch late in the afternoon of the 13th and looked around for a boat, and left

word at Martin's office for him to come down to our office.
He came down in the afternoon and said he had this boat,
and would charter her for $6 00 per hour, if we would
furnish a pilot and coal; I told him that was rather high,
and that we would look around, and he might come in
again ; finally he came in again, and we told him we could
give him $4 50 an hour, and pay for his pilot and coal. I
asked him what a pilot would cost, and he said he did not
know, that he would get one as cheap as he possibly could.
Afterwards he brought in Captain Cutler and introduced
him to me, and said he was a good pilot and would go for
$5 a day. I asked him if he was satisfied with the pilot,
and he said he was *perfectly satisfied*. I told him that I
knew nothing about the pilots along the coast, and that he
might look out for his own pilot. Subsequently the wit-
ness was interrogated by plaintiff's counsel in regard to a
letter he wrote to the defendant on the 14th of Novem-
ber, 1862, in regard to the matter, of which the following
is an extract :

"*New York, Nov.* 14, 1862.
"W. A. FARNSWORTH, Esq., *Lewes Del.*

"DEAR SIR :—We received a dispatch from you late
yesterday evening, saying, ' send me small tow-boat, steam
pump, engineer, new diving apparatus and diver, or telegraph
Eben Eaton at Boston to come ; make best trade you can.'

" Immediately after receiving the dispatch we commenced
to look around for a tug-boat and found that the smallest
boats would not go outside, and that the best we could do
was to charter the steamer May Queen at the rate of $4 50
per hour, coal to be furnished by us, coal sufficient for the
passage down will put on board here at $5 50 per ton, and
whatever the steamer may require afterwards you can proba-
bly furnish from there.

" We are also obliged to furnish a pilot at $5 per day, he
agreeing to work and render you all the assistance he can in
getting off the bark."

Martin agt. Farnsworth.

Q. Was it true on the 14th of November, when you wrote that letter, you were to furnish a pilot at $5 a day ?

A. Yes, I suppose it was.

By defendant's counsel :

Q. What do you mean in that letter when you say " we are also obliged to furnish a pilot" ?

A. I meant we would have to pay $5 a day for a pilot, in addition to the $4 50 an hour, that is what I meant, and nothing more or less.

Abner Cutler (the pilot in question) testified, on the part of the defendant, in regard to the employment of himself as pilot on this occasion :

Mr. Martin came to the Hell Gate pilot office, and asked if there were any coast pilots ; the gentleman keeping the place pointed me out ; Martin asked if I was a coast pilot. I said, yes ; he said he had a boat going south, and wanted to know what I would charge to go to the Breakwater ; I said $5 a day. He said that would do, that that was the sum to which he was limited to pay ; he invited me to go into Duncan's office, *as they paid the price of the coast pilot.* He introduced me as the man he had selected to go and pilot the boat down. Mr. Duncan asked me if I was a coast pilot, a competent pilot, or acquainted down there ; I told him I was. He asked me what wages I charged ; I told him $5. Mr. Martin said, " I believe that is what we agreed upon." Mr. Duncan asked Mr. Martin if he was satisfied with me, and he said he was. We started, I think, the 14th November, on a Friday, in the afternoon.

George Gregory, a witness on the part of the plaintiff, testified as follows :

I know Farnsworth, and have seen Mr. Martin, the plaintiff. I was present at Mr. Duncan's office at the time of a negotiation for the steam-tug May Queen, in November, 1862. I heard Mr. Martin and Mr. Duncan trying to make a bargain for the charter of the steamboat ; I forget the boat's name ; Mr. Martin asked six dollars an hour for his

boat; they did not agree on that; Mr. Duncan offered him four dollars and a half an hour for the boat, which Mr. Martin accepted; then Mr. Martin wanted Mr. Duncan to furnish him with a coast pilot, which Mr. Duncan refused to do; Mr. Duncan proposed to pay the hire of the pilot and let Mr. Martin furnish his own pilot; Mr. Martin went out, and was gone I suppose half an hour, and came back with a man and introduced him as Captain Cutler; Mr. Duncan asked one of them if he was a good pilot on the coast; Mr. Martin said he was satisfied with him.

The following statement of facts in regard to the voyage and the loss of the said steam-tug appeared from the evidence on the trial, and is collated from the testimony of all the witnesses:

The vessel sailed from New York harbor in the afternoon or evening of Friday, the 14th of November, 1862, bound for Delaware Breakwater, distant about one hundred and twenty miles. She was manned by a captain or master, first officer or mate, engineer, fireman, pilot, and three other mariners. The pilot was the same one heretofore referred to as the coast pilot engaged for the voyage. He had been acting as coast pilot for four years, and had been a sailor since his youth, a period of about thirty-four years, during which time he had been mate of a brig and a ship and master of a brig, and knew the courses and route of the proposed voyage, and the coast along which the vessel would pass. That night or early next morning, there was a fresh breeze blowing that raised considerable sea, and the master thought the weather too rough to run the vessel, or that she was not sufficiently strong to run in such weather, and that it would endanger her to stay out, and he ordered the pilot to make a harbor. The pilot thought the boat should stay out, and go on her voyage, and that she could stay out with safety; that there was no danger from the wind or sea, and she could go on to the Breakwater, then distant about fifty miles, which with the speed she was then making she would

reach in eight or nine hours; but agreeably to the master's order or request, the pilot went into Absecom harbor, eighty miles from New York, and reached anchorage therein at half-past ten o'clock, Saturday forenoon, November 15, 1862, where they remained until about two o'clock Monday afternoon, November 17, when they continued the voyage. When night came they were in sight of Cape May light, west-south-west from the vessel. The weather had thickened and rain had commenced. The pilot was at the helm, The captain, mate, and engineer had gone below to supper, leaving the pilot, the only person on deck, there being no lookout. The pilot saw on the starboard bow of his vessel a single light. He took his glass and examined her. She was under sail and showed but one light and did not whistle, and the pilot concluded that she was a sailing vessel, as he had the right to, for vessels under steam should show more than one light, and are bound to whistle when approaching. He accordingly put the helm of the May Queen to starboard to turn her away from the approaching vessel. She, however, proved to be the United States steam gunboat Wamsutta, which, seeing the May Queen ahead, put her own helm to port. A collision occurred between the two vessels, by which the May Queen was lost.

The captain and mate of the Wamsutta, testified that the lights of the tug were seen by them at the distance of an eighth of a mile, and supposing the tug was heading towards them they kept off to the eastward, and the tug seemed to do so likewise. There was no sounding of the steam-whistle by the Wamsutta.

The collision seems to have occurred from the mistake of the pilot of the steam-tug, mistaking the Wamsutta for a sailing vessel coming in an opposite direction; and being off his starboard bow, he kept the tug to the eastward to avoid crossing the bow of the supposed sailing vessel. The people on the Wamsutta, knowing the tug to be a steamer, kept off to the eastward, but sounding no whistle.

The court (after objection by defendant) allowed plaintiff to prove by witnesses a custom or usage in respect to the relation between a coast pilot and the master of a vessel on board of a vessel at sea, their respective authority in command over each other, and upon which rested the absolute charge and control of the vessel. To this ruling defendant excepted, the witnesses introduced by the plaintiff testifying substantially that a coast pilot took absolute charge and had absolute control of a vessel, her watch and crew, and the discipline of the same, her lights, and her officers including the master, and that the latter was subordinate to the pilot, who was supreme in command, and that the latter was not bound to obey any order or command of the master. This testimoney was contested by other witnesses. The testimony of the latter tended to establish that the only duties of a coast pilot on board a vessel was to direct as to the course of navigation of the vessel along the coast, and to take the vessel in and out of ports and harbors as directed by the master, who was supreme in command and had absolute charge and control of the vessel and crew, including the pilot and upon whom (the master) devolved all the responsibility of the care and government of the vessel, and the control and discipline of his officers and mariners, on board of the same.

There was testimony uncontradicted in regard to the incompetency and inexperience of Martin, the master of the tug, as a master of a vessel at sea, and also that there was no regular watch kept on board or on deck, and that there was no lookout on deck at the time of the accident or for some time previous.

At the close of the testimony in the case, the defendant moved to dismiss the complaint on the following grounds:

*First.* The pilot was plaintiff's agent. There is no law requiring plaintiff to take a pilot on board. He selected the pilot. The pilot was doing his work. Metcalf & Duncan had no power to employ and put a pilot on board the

ship, or in any manner to bind the defendant for the safe navigation of the ship.

*Second.* The negligence of the master and crew contributed to the injury. Neither the captain nor mate had been on watch within twenty-five minutes previous to the accident.

There is no proof that there was a proper lookout posted, and that he was attending to his duty at the time of and just previous to the collision, and the person who should have been on the lookout was in court, and was not called by the plaintiff. There is no evidence that the collision was the result of the negligence of the pilot. That the evidence shows that the plaintiff found the pilot, brought him to Metcalf & Duncan, and expressed his satisfaction as to his competency as a pilot, and therefore he was not the agent of the defendant. Also, that the evidence shows that Cutler, the pilot, was employed by both parties to do an act in which they were mutually interested. He was, therefore, the agent of both parties, and being the agent of both parties, neither can recover against the other for any act of his or any negligence.

This motion was denied and defendant excepted.

The plaintiff claimed to recover, in this action, the value of the lost steam-tug from the defendant, assuming that, under the contract, the defendant became liable for the safe navigation and management of the tug under said pilot, and that the same was lost through the carelessness, unskilfulness and negligence of said pilot upon said voyage.

Defendant denies his liability, and claiming the loss to have occurred through the fault of the plaintiff and his agents and servants, demands judgment for the value of the property on board belonging to defendant, which was also lost.

The jury found a verdict for the sum of $5,602 50 in favor of plaintiff, upon which judgment was entered, and from which judgment the defendant appeals.

BENEDICT, BURR & BENEDICT, *for appellants.*
MARTIN & SMITH, *for respondents.*

SPENCER, J.—There was much testimony of a conflicting character before the court and jury on the trial of this action; but in the view I take of the case, and the principles upon which it should have been decided, much of this testimony was irrelevant, and immaterial to the issues. With due respect for the learned judge and counsel before and by whom this case was tried, I think that the principles and precedents that should govern maritime contracts, like a charter of a vessel, or the relations existing between and which control the action, service and liability of a master and mariners upon a vessel at sea, were overlooked.

The questions considered by the court below appear to have been as follows:

*First.* Did the telegram authorize Messrs. Metcalf & Duncan to charter this tug for the service, and to contract to furnish a pilot for her navigation on the proposed voyage?

*Second.* And if the authority was sufficient, and the agreement was *to furnish a pilot* (instead of *paying for the service of a pilot,* as contended by defendant), did the contract have the effect of placing the tug in the possession and under the control and management of the defendant to that degree, that he became liable for the care and management and the safe navigation of the vessel in her contemplated voyage, and for any negligence, lack of skill, or diligence on the part of the pilot so furnished, or on the part of the master and crew of the vessel during said voyage?

*Third.* Was the vessel lost by or through the want of skill or the negligence of the pilot in the performance of his duties as such, or of the master and crew, while acting under his management and control during the voyage?

*Fourth.* These questions being decided in the affirmative, what was the amount of plaintiff's damages in the premises?

I think the telegram was sufficient to authorize Metcalf

& Duncan to do in the premises all that plaintiff claims they did do, and that their action bound the defendant. I think the words " send me small tug-boat " were most full and comprehensive, as authority to provide the same in any manner and upon the best terms possible, and their contracts in the premises (whatever the same were) for tug-boat, steam-pump, engineer and diver for this service were binding upon their principal.

I think the weight of evidence, however preponderates in favor of the version of the contract as claimed by the defendant. The plaintiff is the only witness whose testimony tends to establish that the contract was *to furnish a pilot*, and his great interest in the result of the action raises a presumption against the absolute accuracy of his memory in regard to the specific words that were said or were used by Metcalf & Duncan in making the contract, especially when contradicted by the positive testimony of Mr. Duncan, who made the contract, and the witness George Gregory, who was present at the time the contract was made; and the testimony of these two is supported by that of the pilot, Cutler, in regard to what took place and was said when he (Cutler) was introduced to Duncan.

I think the court should have concluded from this testimony that plaintiff was mistaken or forgetful of the specific terms of the contract about the pilot, and that in truth and fact Duncan, acting as the agent of defendant, only agreed *to pay the expense or hire of the pilot* for the voyage, and upon such a conclusion the court should have dismissed the complaint upon motion, and the refusal so to do, was error. I think, also, that upon the charge and submission of the case to the jury, the jury should have found a verdict for the defendant. In finding for the plaintiff the jury not only disregarded the charge of the court, but also found a verdict wholly unsupported by the evidence that was material in the case, and therefore, the judgment should be reversed. But assuming that the court and jury were correct in their conclusion that

defendant did contract with the plaintiff *" to furnish a coast pilot for the voyage,"* and thereby incurred all the liabilities that would ensue from the use of those words, yet I hold as a conclusion of law that such a contract did not make him responsible for the care and management and safe navigation of the vessel on the said voyage, but that the said pilot was received and placed upon said vessel, simply as a pilot at sea, to advise and direct the course of the vessel to her place of destination, subject to and under the general authority, and command of her master, who was the superior officer of such pilot during the whole voyage, and upon whom (the master) devolved the responsibility of the general care and management of such vessel during her voyage. I hold that this pilot was only a mariner or a subordinate officer, whose duty was to advise and direct the master in regard to the course the vessel should take, or in other words *the navigation of the vessel* from New York to the Delaware Breakwater. He was an assistant for that purpose; supposed to know the coast near to which their course of navigation lay, and to know the ports and harbors into which the vessel could be taken in case of storm or peril of any kind, and to know and be able to advise and direct the best courses upon which to sail in order to accomplish the voyage in the most safe and expeditious manner. Yet he (the pilot) could give no order or direction that could be enforced, except such as was approved and executed by and through the superior and supreme authority of the master. The extreme limit of the responsibility of the defendant under this contract was, that he should furnish a man that was a good coast pilot, one who possessed knowledge and experience in regard to the coast, the locality of the point to be reached, and the approaches thereto, to that degree that he was competent to advise the master, and, under his authority, direct the course or navigation of such vessel upon such voyage *along the coast,* and thus enable the master to safely navigate his

vessel and make a voyage *along*, and to a point upon, a coast with which he and his other officers and mariners were unacquainted ?

There are generally headlands, islands, shoals, currents, inlets, beacons, or harbors (as in this case,) to be sought or avoided, in such a voyage, and which are among the incidents of coast navigation, and a full knowledge of these the coast pilot is presumed to possess. He is a pathfinder for the vessel upon such a voyage. He points out and directs the best route and course to accomplish the voyage expeditiously and safely *along the coast* to the destined port.

There is no question in this case as to the competency of Cutler in these respects. In fact, the evidence fully establishes that he was a coast pilot of experience and ability, and I think the defendant *furnished a coast pilot* fully competent in all respects, when he furnished Cutler as one.

There is no evidence of any lack of skill, nor negligence in the performance of his duties as a *coast pilot* on the part of Cutler, as I view this case. If there was negligence, lack of skill or judgment on his part, of any kind, it was in the performance of other duties than those of *coast pilot*, namely, in those of steersman, lookout, or mariner, which he was at the time (by the consent and direction of the master) performing on said boat.

I also hold that the court below erred in its ruling when it admitted testimony, objected to by defendant, of a usage or custom in regard to coast pilots having absolute and supreme control and management of a vessel on a voyage like this as the superior of the master of said vessel.

Such control and management and the government and discipline of a vessel like this engaged on such a voyage, should be determined as a question of law, and cannot be considered as a question of fact based upon custom or usage. This power and authority is clearly and unques-

Martin agt. Farnsworth.

tionably conferred upon and intrusted *to the master of the vessel* by the common, civil, and maritime law, and he (the master) must be held responsible for its use, non-use, or abuse, and he cannot evade that responsibility nor shift the same from himself upon other persons by virtue of any custom or usage to the contrary.

*Abbott on Shipping*, at page 231, defines this law: "By the common law the master has authority over all the mariners on board the ship in all lawful matters relating to the navigation of the ship. Such authority is absolutely necessary for the safety of the ship and the lives of all persons on board."

The late Judge BETTS, who was distinguished for his learning and ability as a judge of maritime law, has expressed himself in many cases to the same effect. In one he uses these words: "The master of a vessel has complete authority in everything relating to the management and conduct of his vessel."

See also opinion of Judge WARE, (*Butler* agt. *McLellan, et al., Ware's Rep.*, 222) : "The captain has all the authority of command on board the vessel, and the inferior officers, as well as the common seamen, are bound to obey his orders."

The admiralty decisions favor only a single division of persons in charge of a ship, viz., that of "master and mariners" or "master and crew." "In cases of a lien upon a ship for wages under admiralty law, the pilot as also all other officers under the rank of master are deemed and classed as mariners, and hold their lien as such, which is prohibited to the master. He has no lien because he is the master, the agent and representative of the owners, in the performance of all his duties as master. In salvage and prize cases, the pilot has been classed and considerd as a mariner. In one of the oldest treaties upon maritime law, a copy of which is to be found in the appendix to 2d *vol., Peter's Admiralty Decisions*, the power and responsibility of a master of a vessel are thus defined :

A master of a ship is one who for his knowledge in navigation and for his fidelity and discretion hath the government of the ship committed to his care and management."

" The law looks upon him as the officer who must render and give an account *for the whole charge*, when once committed to his care and custody, and if misfortunes happen through negligence, wilfullness, or ignorance, of himself or his mariners, *he must be responsible.*"

" The master hath the supreme rule on shipboard."

The duties of mariners are comprised in the words " Obedience to the lawful commands of the master."

" The mariners are under his correction and government, *and know no other superior on shipboard but himself.*"

The "*Laws of Oberon*," the "*Laws of Wisbuy*," the "*Laws of the Hanse Towns*," the "*Marine Ordinances of France, or of Louis XIV.*," comprise the earliest sea laws codified, and are the basis of the present maritime law of this country, as also of all other nations.

They recognize the office of pilot on board of a vessel for the voyage, and distinguish between his duties and those of a harbor or river pilot.

" The local pilots were called 'locmen,' and were mariners hired at every river or harbor to assist the pilot of the vessel in guiding the course of the vessel into harbor, or through a river or channel, so as to avoid shoals, rocks, &c., &c. If a vessel was lost by the false direction or ignorance of the local pilot, he was liable to lose his head at the hands of the master, or any of the mariners, who were authorized to cut it off, as a penalty for his false pretences of knowledge or skill" *(Laws of Oberon, Arts.* 13 *& 14, and note of Cleirac to Arts.* 1 *& 14).*

" The master shall *chuse* the ship's company *and hire the pilots*, mates and mariners."

" We enjoin all masters making long voyages, to assemble every day at noon, or oftener if necessary, the mates and pilots and other expert persons, and to *confer with them*

about the courses made and *to be made" ( Ordinances of France )*.

" The master must understand the art of piloting and navigation, that he may know how to *control the pilot, and mind* how he steers the ship."

" In a merchantman the first officer is the master, the second the pilot (who enjoyed that place because in honor of the sciences he *profest* and *practysed )*, the third the mate,"" &c. *(Note to Art.* 1, *Laws of Oberon)*.

By the *Laws of Wisbuy*, the master was obliged to hire a local pilot of a harbor, or river, or channel, when requested so to do by *his own pilot* and his mariners.

The first article of these last-named laws classifies the mate and pilot as mariners.

The second article provides that every pilot who does not understand his business shall repay the master the wages advanced to him, and half as much more as he had promised him.

The fifty-ninth article provides, that when a ship is in or before a harbor or river with which her pilot (the ship's pilot) is not well acquainted, the master ought to hire one at the place to carry his ship in.

The distinction between a harbor, river, or channel pilot and a pilot on board ship during the whole voyage is recognized and defined in *Abbott on Shipping, p.* 266, § 195, and several decisions are there quoted in the notes, to the effect that the latter kind are properly mariners. I do not consider nor discuss this case as one affected by or connected with the rules that govern the management of a vessel when under the direction or subject to the duties of a licensed harbor or river pilot, on pilot grounds. This is not such a case. It is that of a pilot for a voyage, and governed by the general rules of law applicable to the relations of master and pilot at sea or on a voyage, which, I hold, cannot be determined by usuage or custom.

The master of the tug, in this instance, did not provide a

Martin agt. Farnsworth.

proper watch, nor a lookout, on board of his vessel. He placed the pilot in charge of the wheel, and he and the mate descended to the kitchen for their supper. He left no one upon the deck except the pilot, and he at the wheel. The pilot, acting as wheelsman, without captain, mate, watch, or lookout, or any one within his call to aid him, or advise with him in any emergency, was left exclusively to his own observation and judgment and action, in relation to any approaching vessel. He saw one that he concluded was a sailing vessel, headed towards the northwest, or to his starboard, He kept on his course instead of steering to the starboard, or crossing the bow of what he deemed a sailing vessel. This was right, according to his sight and judgment, in relation to the approaching vessel at the time. His observation, judgment, and action were in fault, for the supposed sailing vessel proved to be a steamer, and he discovered his mistake too late to avoid the direful results of a collision. I hold that in such a case, neither he nor his employers should be held liable for this error of judgment, which depended upon his observation, and was not the result of carelessness, nor want of skill as a *coast pilot*.

*First.* As wheelsman, or helmsman, in full and sole charge of the deck, he exercised his best judgment and skill and the greatest care and diligence, and was not guilty of any negligence of his duty as such, and he is not liable for the mistake in his observations.

*Second.* As wheelsman or helmsman he was the servant and agent of the plaintiff, and not of the defendant. He was not performing the duties of a coast pilot at the time.

*Third.* As coast pilot he was under and subject to the commands of the master of the tug, and was substantially the servant and agent of the plaintiff, and neither he nor his employer was liable to the plaintiff for any accident or damages, except those which could be directly traced to his ignorance of the coast, or lack of knowledge and skill as a coast pilot, and neither he nor his employers were liable

or responsible for the proper management of the vessel, for proper helmsman, lights, lookouts, watch, its speed, or any other matter pertaining to its government and discipline on the voyage.

The master was responsible for all these things, and if, through any fault and negligence of his in the premises, loss occurred, the plaintiff must bear the same.

Such a claim as this on the part of plaintiff cannot be sustained.

I hold that the master and his officers and mariners, including this coast pilot, were the agents and servants of the plaintiff. The master was the superior officer over the pilot; he was supreme in command upon that vessel. He was under no other obligation to heed the advice or direction of the pilot, nor to enforce the same, beyond the obligation that arose from his conviction of mind and judgment that the advice was good, and that the direction was entitled to consideration and enforcement.

And it seems the parties understood their respective relations and acted thereupon, for the evidence tells us that the master consulted with the pilot about entering a harbor on the way down, and ascertained that Absecom harbor could be most conveniently reached. The pilot thought and advised that it was unnecessary to make a harbor; that it was proper and safe for the vessel to continue on its direct course at sea towards the Delaware Breakwater.

The master differed in opinion and judgment with the pilot, and commanded him to make Absecom harbor, and the pilot very properly obeyed the command or request of his superior officer.

The *coast pilot* was overruled by the master, and submitted. The master was responsible for this deviation from their course and delay in their voyage; and if, upon the resumption of the voyage, there was a lack of proper lights, lookouts, watches, or any other matters necessary for the proper and careful management and sailing of the vessel on

Martin agt. Farnsworth.

her voyage, or an absence of necessary precautions against peril at sea, the exercise of which might have avoided this calamity, he is equally responsible, and he and his employers should not be relieved therefrom, and the consequences of a collision fall upon a coast pilot on board, who was his inferior officer, and engaged at the time in the performance of other duties than those of coast pilot, to which he had had been assigned, or permitted to perform, by the master.

The judgment should be reversed, and a new trial ordered, with costs to abide the event.

Judge MONELL, in his opinion, concurs in the conclusion without discussing the relations of master and pilot.